### SHONGO v. MILLER et al.

(Supreme Court, Appellate Division, Fourth Department. November 22, 1899.)

PUBLIC LANDS—INDIAN LANDS—LEASES—VALIDITY.

> Act Cong. 1802, c. 13 (2 Stat. 139) § 12, declares that no purchase, grant, lease, or other conveyance of lands from any Indian or nation to a white man within the bounds of the United States shall be valid, in law or equity, unless made by treaty or convention entered into pursuant to the constitution. 12 Stat. 427, authorizes the allotment of reservation lands to individual Indians desirous of adopting civilized life. Members of the Seneca Nation having leased a large part of their reservation to whites, with the approval of the nation, in violation of the act, and the property so leased having been substantially improved by the building of villages, etc., thereon, Act Cong. Feb. 19, 1875, was passed, validating such leases; and section 3 provided that all leases of land in such villages in which Indians, as individuals, and the Seneca Nation, or persons claiming under them, are lessors, should be valid and binding for five years from the date of the enactment unless they should earlier expire, and at the end of such period, or the maturity of said leases, title should be reinvested in the nation, subject to the condition that a new lease should be given by the Nation to the white lessee for a period of 12 years; and by Act Cong. Sept. 30, 1890, the renewable period of such leases was extended to 99 years. *Held*, that though the act of 1875 was in contravention of the treaty made with the Six Nations November 11, 1794 (7 Stat. 44, art. 2), guarantying to the Indians incontestable title to reservation lands, yet, since the United States was the ultimate owner of such lands, the act superseded the treaty provisions, and hence a lease of reservation lands executed by the nation March 9, 1880, for 12 years, and renewed to an assignee of the lessee for 99 years, April 28, 1892, was valid.

Appeal from judgment on report of referee.

Suit by Daniel E. Shongo against John Miller and Henry Sigel to restrain the dispossession of tenants of Indian lands of which plaintiff claimed to be the owner. From a judgment dismissing the complaint and vacating a temporary injunction, plaintiff appeals. Affirmed.

The plaintiff is an Indian, and one of the Seneca Nation, whose reservation, the Allegany, is in the county of Cattaraugus. The lands in controversy comprise a hotel property situated in the village of Carrollton, which is on that reservation. Charles Halftown, an Indian of this tribe, claimed to own the land in question by title and possession conforming to the usages of the tribe. He had leased the same to white men, and by a written instrument dated July 23, 1869, leased the premises to Peter Boyle, a white man, for the annual rental of $40, and for the period of 12 years. Boyle went into possession under his lease, cleared the land, which had grown up to underbrush, and erected a large hotel building thereon. By a like instrument dated June 1, 1874, Halftown again leased these premises to Boyle for another term of 12 years, commencing July 23, 1881, upon the expiration of the first lease. Upon Boyle's application, the Indian nation, by its council, and pursuant to the act of congress passed February 19, 1875, confirmed the first lease from Halftown on

March 9, 1880. Boyle died intestate in 1882, in the occupation of these premises; leaving a widow and children, who continued in the occupation of the hotel property. Charles Nies acquired the Boyle title by purchase, and on the 22d day of April, 1892, while he was the owner, obtained from the council of the Seneca Nation a renewal of this lease for the period of 99 years, in accordance with the act of congress approved September 30, 1890. On November 15, 1892, Nies conveyed these premises to Hattie E. Boyle, and she gave back to Nies a purchase-money mortgage for $4,000, which Nies subsequently assigned to the defendant Miller. The latter foreclosed his mortgage, obtained judgment, and the land was sold to Miller, pursuant thereto, June 29, 1896, which sale was duly confirmed. A writ of assistance was granted, and the defendant Sigel, as sheriff of the county, attempted its enforcement. The Boyles were in possession, and, in consequence of the illness of Miss Boyle, Miller executed a lease for three days to them. They declined to remove upon the expiration of the lease, and summary proceedings were instituted. The plaintiff, claiming he was the owner and entitled to the possession of this property, brought this action to establish his title, and to prevent the defendants from acquiring possession of the same, and obtained a temporary injunction restraining the sheriff from executing his process to oust the Boyles or those in possession. Charles Halftown died in 1884, and his property was distributed, according to the Indian custom, to his son, Charles Halftown, Jr., and to his daughter, Teresa Halftown. The son died shortly after, and his title passed to his sister. During the pendency of the foreclosure action she conveyed to the plaintiff, who claims to own the property by virtue of this deed. Other facts are stated in the opinion.

Argued before HARDIN, P. J., and ADAMS, McLENNAN, SPRING, and SMITH, JJ.

Charles Van Voorhis, for appellant.
George W. Cole, for respondents.

SPRING, J. The national government, by its treaties and congressional acts, has dealt with the Indians in their tribal capacity. The title of the land on the various Indian reservations has been treated as belonging to the tribe in possession, and, whenever the individual Indian has been recognized in his possession or ownership of the land, it has been to subserve some ulterior, paramount purpose. And while the Indian title preceded the forced possession acquired by the whites by superior strength on the early settlement of the country, and in the rapid absorption of territory to meet the demands of a growing nation, still that title has been under the dominion of the United States government. From the early history of the country the Indians have been regarded as the wards of the nation. As was said by Chief Justice Marshall in Cherokee Nation v. Georgia, 5 Pet. 1, at page 17, 8 L. Ed. 31: "They are in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian." It was early apparent that, if the Indians were to retain the possession and title of lands set apart for them by the government in its guardianship over them, conveyances or leases to the white people must be inhibited. In recognition both of the dependence of the Indian and of the greed of their white brothers, by chapter 13, Acts 1802 (2 Stat. 139) it is provided, in section 12, "that no purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian or nation, or tribes of Indians within the bounds of the United States, shall be of any validity in law or equity, unless the same be made by treaty or convention entered

into pursuant to the constitution"; and the act further makes the violation of this prohibition a misdemeanor. This same prohibition was embodied in the act regulating trade and intercourse with the Indians passed June 30, 1834 (4 Stat. 729, § 12). While the tribal relation was recognized by the United States government as the unit, yet the individual Indian did acquire possession and ownership of specific tracts of land. These titles, founded on cultivation and occupancy, were upheld by the Indian nation, and the muniments of title were recorded in their books; and transmission by devise, or to the heirs at law in case of intestacy, was sanctioned. To stimulate and foster this sentiment of thrift, the individual Indian, "being desirous to adopt the habits of civilized life," was allowed to become the beneficiary in the allotment of land, and the agent or superintendent in charge was directed to protect him in the quiet and peaceable enjoyment of land so alloted to him. 12 Stat. 427. But in this congressional control over the Indians the right of dominion in the national government has always been maintained. If the Indian was given the right to acquire land on the reservation, it was for the purpose of his enlightenment and advancement, and no greater title was vested in him than his tribe possessed. Disregarding the injunction that the leases and conveyances to the white people were prohibited, the individual Indians on the Allegany reservation leased to the white people constantly. There was little cultivation of the land by the Indians. The Seneca Nation owned a strip 1 mile wide along the banks of the Allegany river, for 40 miles, and it was valuable, tillable land. The influx of the railroads made the cultivation of this land and the location of villages almost a necessity. Out of this emergency grew the wholesale leasing of land mainly by the individual Indians, whose title depended on the allotment by their nation. Six villages were established within the limits of the reservation, and Salamanca, the largest of these, had a population of 3,000 people. The title to all this land rested upon these forbidden leases, was of precarious tenure, and the occupant could be dispossessed summarily at any time. The land, when taken, was practically of little value to the Indians, and little revenue was derived from it; but the white occupants attorned to their respective lessors, and made valuable improvements. The uncertain tenure of the title of the lessee retarded the growth of the village, and lessened the value of the leased land. The leases made by the individual Indians were recognized by the council of the Seneca Nation, and license fees or taxes were in some instances paid directly to the council, to obtain its sanction to these leases. Therefore both the individual Indians and the tribe were in open violation of the congressional enactments prohibiting leases to the white people. The land was designed for the benefit of the Indian, but for the purpose of cultivation, to instill into him habits of thrift, economy, and good husbandry, not with a view to speculation or commerce with his white brother. This situation therefore confronted congress: The Indians had leased their lands to the whites. The latter had made improvements, and established these six villages. The Seneca Nation not merely acquiesced in this disregard of the prohibition to lease to the white people, but received

benefit from it, and encouraged and abetted this transfer of the property. The congress of the United States, to make more effective titles which had originated under the protection and instigation of the tribe, passed the act approved February 19, 1875. This act did not create any leases. It gave vitality, by congressional approval, to what had already received the indorsement of the Seneca Nation. Congress, in effect, said to the Seneca Nation:

"You have violated the treaty with the United States, by farming out your lands to the whites; but, inasmuch as you have voluntarily done this, and received a valuable consideration therefor, and important rights have arisen through your unauthorized action, we realize you should be estopped to annul these leases, and some tangible life should be imparted to them."

The first section of this act ratified the leases made by the Seneca Nation to railroad corporations, and gave the nation authority to lease land for railroad purposes. The second section provided for the appointment of commissioners to establish the boundaries of these six villages. In the third section all leases of land in any of said villages in which the Indians, as individuals, the Seneca Nation, or persons claiming under them, are lessors, are declared valid and binding upon the parties thereto and upon the nation for 5 years from the date of the enactment, unless they earlier expire; and at the maturity of said leases terminating within said period, and in any event at the end of said period, the title of all of said lands is to be reinvested in the Seneca Nation, with power to lease the same. But said reinvesting of the title is subject to the condition that a new lease is to be given by the nation in each case to the white person who has made improvements and is in possession under an outstanding lease; that said renewal lease shall be for the period of 12 years, and the nation is to be the lessor. If disagreement arises over the amount of the annual rent or the terms of the lease, referees are provided for, to adjust these differences, whose determinations shall be final. The right of renewal at the expiration of the 12 years is given, at the option of the lessee, his heirs or assigns. That is, this section was operative upon existing leases, unqualifiedly confirming them for 5 years, whether given by the nation or individuals. However long they might by their terms continue, all were made to expire as early as February 19, 1880, so that new leases, assuring a valid title during their life, might be given of that date. The giving of life to these invalid leases for 5 years was preliminary to the ulterior purpose of shaping matters so the council could renew. Section 4 of the act gave the nation authority to lease lands which no individual Indian or Indians or their lessors could rightfully hold under the tribal customs; that is, some of the land within the boundaries of these villages had never been allotted to the individual Indians or leased to the white people, but the title still remained in the Seneca Nation; and the right to lease these lands was accorded to the Nation, bringing them within the same category as the lands occupied under lease. Congress, however, was particular to exempt from this clause any land which individual Indians held, and which had not been leased to the whites. The right of a white person to possess by virtue of a transaction with an individual In-

dian must depend upon a lease. Section 5 directed the commissioners to define the boundaries of these several leased parcels, and provided for the recording of the leases in the clerk's office of Cattaraugus county, and for their transfer by assignment, and transmission by will or the laws of descent, and then added: "Provided, however, that the rights of Indians in such leases shall descend as provided by the laws of said Seneca Nation." The individual Indian possessed the right to his lease for the term of 5 years after the passage of the act, if it contained so much of unexpired life. And this clause may relate to the title during that period. Again, it may be a qualifying clause, indicating that congress did not seek to interfere with the council or the Seneca Nation in its domestic or tribal customs, and, if it wished the rent to be paid to the lessor, there would be no congressional interference. It certainly did not intend to recognize the validity of any title in the individual Indian of lands which he had leased. That would have been in contravention of the import of the whole act, as it is framed in recognition of the tribal title, and in disregard of the title of the individual. The act is very specific in providing that the title is to vest in the nation upon the expiration of the leases. To be sure, the existing leases are the basis of the operation of the act. But that was necessary, as the design was to assure title to the white lessees, and in no other way could the purpose be accomplished than by confirming these invalid instruments. In 1890 this act was amended by making the renewable period 99 years.

But it is urged strenuously that the act of congress is a violation of the treaty made with the Six Nations, of which the Senecas formed a part, November 11, 1794 (7 Stat. 44). Article 2 of said treaty acknowledges the reserved lands to be the property of the Indians, and guaranties that title incontestably in the Indians "until they choose to sell them to the people of the United States who have the right to purchase." The third article of the treaty, after defining the boundaries of the Seneca Nation, provides:

"Now, the United States acknowledge all the lands within the above named boundaries to be the property of the Seneca Indians and the United States will never claim the same nor disturb the Seneca Nation nor any of the Six Nations, or any of their Indian friends residing thereon and united with them, in the free use and enjoyment thereof, but it shall remain theirs until they choose to sell the same to the people of the United States, who have the right to purchase."

The act of congress does not devest the Indian nation of its title. The ultimate title is already in the United States, but its assertion must await the voluntary action of the Seneca Nation. The nation itself, by acquiescence or affirmative action, had infringed upon the spirit of this treaty. It had already allowed the rights of the white lessees to become fixed, as a physical fact; and valuable improvements had been made in reliance upon these leases, flimsy as they were. This transaction between two white people would result in estopping the lessor from impugning the title of his lessee during the life of the term, without a restoration of the improvements made. It would be unjust for the Indian nation to assent to a lease if made by an individual Indian, and derive benefits there-

from, and then claim the lease was an infraction of a treaty granting or confirming title in the nation. These leases were each for a period of 12 years, and renewals continued, as a rule, and the improvements under them were substantial. Consequently their perpetual existence was in the contemplation of the parties, with the sanction of the nation. The United States congress appreciated the situation, and, without extinguishing the Indian title, sought to make property rights stable in the lessee by carrying along the identical policy which had been inaugurated and practiced by the Indians themselves. Congress was not responsible for the condition of affairs, but it desired that justice be done to its own citizens. Prior to 1871 the dealings between the United States government and the Indian nations had been by treaty, but that course was then abandoned, and the method adopted has since been by acts of congress. U. S. v. Kagama, 118 U. S. 375–382, 6 Sup. Ct. 1109, 30 L. Ed. 228. But the treaty and the act of congress are of like force. Whitney v. Robertson, 124 U. S. 190, 8 Sup. Ct. 456, 31 L. Ed. 386. In determining the effect of this act of congress, it is essential to keep in mind that the land belongs to the United States upon the extinction of the Indian title; that the Indians are the wards of the government, and subject to its control and management. The power of the general government over them is supreme. Cherokee Tobacco, 11 Wall. 616, 20 L. Ed. 227; U. S. v. Kagama, 118 U. S. 381, 6 Sup. Ct. 1109, 30 L. Ed. 228. In Ryan v. Knorr, 19 Hun, 540, Judge Bradley, in answering the criticism that this act is opposed to the treaty, says:

"But, assuming that the provision which purports to bind the Seneca Nation to the validity of the leases would be in contravention of such part of the treaty as secures the land to the nation, it is well settled that an act of congress may supersede a prior treaty. The consequences in all such cases give rise to questions which must be met by the political department of the government. They are beyond the sphere of judicial cognizance."

Baker v. Johns, 38 Hun, 625; Railroad Co. v. Lavery, 75 Hun, 396, 27 N. Y. Supp. 443, affirmed in 149 N. Y. 576, 43 N. E. 986; Sheehan v. Mayer, 41 Hun, 609, affirmed in 129 N. Y. 675, 30 N. E. 868; and Wait v. Jameson, 15 Abb. N. C. 382,—involved leases made in pursuance of this act, and they were sustained by the courts.

In the Cherokee Tobacco Case, 11 Wall. 616, 20 L. Ed. 227, by a treaty made in 1866 between the United States and the Cherokee Nation, every Cherokee Indian was guarantied the right to sell any products of his farm, without restraint. In 1868 the internal revenue laws imposing taxes on distilled spirits, tobacco, etc., were by act of congress made "to extend to any such articles produced anywhere within the exterior boundaries of the United States whether the same shall be in a collection district or not." The defendants, who were Cherokee Indians, were the owners of tobacco in the Cherokee territory, and claimed they were protected by the treaty, and not subject to the payment of the revenue taxes. It was assumed by the United States supreme court that the article in question was repugnant to the treaty provision, and rendered it nugatory, but the court still held the act was valid; deciding that an act of congress may supersede a prior treaty, and that the

consequences rest with the political, not the judicial, department of the government,—and say at page 621, 11 Wall., and page 227, 20 L. Ed.:

"They are beyond the sphere of judicial cognizance. In the case under consideration the act of congress must prevail, as if the treaty were not an element to be considered. If a wrong has been done, the power of redress is with congress, not with the judiciary; and that body, upon being applied to, it is to be presumed, will promptly give the proper relief."

To the same effect are the Chinese Exclusion Case, 130 U. S. 581–602 et seq., 9 Sup. Ct. 623, 32 L. Ed. 1068; Whitney v. Robertson, 124 U. S. 190, 8 Sup. Ct. 426, 31 L. Ed. 386; the Head-Money Cases, 112 U. S. 580–597, 5 Sup. Ct. 247, 28 L. Ed. 798.

By the terms of the act of congress, each renewal lease was to be made at the expiration of 12 years from the date of the original lease. The Boyle lease was given by the nation March 9, 1880, and it consequently expired March 9, 1892, while its renewal to Nies was given April 28, 1892. If the Seneca Nation possessed the power to demise at all, it could waive this provision as to time, if it were of the essence of the act. The assigns of the lessee were in possession by virtue of the Boyle lease, and a fair construction of the act requires that the conduct of the parties in making the renewal be upheld by the court.

Section 2126 of the United States Revised Statutes imposes the burden of proof upon the white person, in a litigation with an Indian involving the rights of property, whenever the Indian shall establish a presumptive title from ownership or possession. After proving the formal title, the plaintiff invoked this statute; but the referee, without ruling upon the precise question, required the plaintiff to present his evidence in chief. This simply involved the question of the order of proof, and the case nowhere reveals that the referee passed upon the applicability of this section, or of its effect if germane. In any event, the view we take of the law pertaining to this case rests upon the undisputed facts, so the ruling, if erroneous, was harmless.

The facts of the case do not tend to support the good faith of the claim of the plaintiff. At the time of the commencement of the foreclosure suit the Boyles were in open, notorious possession of the hotel property. It became evident they were to be dispossessed. Then, for the first time, the plaintiff asserted that he had obtained from Teresa Halftown title to this property, after this foreclosure action was begun. To invite criticism still further, it is proven by the uncontradicted testimony in the case that the plaintiff purchased from the Boyles the furniture in this hotel, of the value of $1,800, making no cash payment therefor, allowing the Boyles to retain possession; and he is to pay for this furniture by applying upon the purchase price rent money from the Boyles at the rate of $15 a month. The proof would seem to indicate there was a collusive purpose in this whole transaction to permit the Boyles to retain the possession of this property.

The judgment is affirmed, with costs to the respondents. All concur.