### UNITED STATES v. SENECA NATION OF NEW YORK INDIANS et al.

#### (District Court, W. D. New York. July 8, 1921.)

Indians ⊙⇒27(2)—Courts without jurisdiction of internal controversies over property rights.

In the absence of congressional legislation bestowing on the individual Indians in the Cattaraugus Reservation the right to litigate internal questions relating to their property rights in the federal courts, and conferring jurisdiction on a District Court to determine such controversies, it will not assume jurisdiction.

In Equity. Suit by the United States, in its own behalf and in behalf of Alexander John and Lorinda John, Indians, against the Seneca Nation of New York Indians and others. Bill dismissed.

Stephen T. Lockwood, U. S. Atty., of Buffalo, N. Y. (John T. Walsh, Asst. U. S. Atty., of Buffalo, N. Y., of counsel), for the United States.

George P. Decker, of Rochester, N. Y., for the Senecas.

HAZEL, District Judge. This is a suit in equity by the United States and a Cayuga Indian named Alexander John, and Lorinda his wife, a Seneca Indian, who are wards of the United States, against

the Seneca Nation of New York Indians and John K. Button, acting surrogate of the Surrogate's Court of Cattaraugus Indian Reservation, and Hattie Snow and Martha Seneca, who are also Seneca tribal Indians, to secure to John and wife their respective rights by partition of certain lands within the bounds of the Cattaraugus Reservation and reserved to the Seneca Nation by treaty.

The bill avers that about 39 acres of land, undivided, are held in severalty by Alexander John and Lorinda, his wife, and defendant Snow as tenants in common—lands that had previously been distributed or awarded to Jesse Turkey, also a Seneca Indian, by the Seneca Nation tribe, and who in his lifetime continuously owned and possessed such lands for more than 40 years before his death—and that division to him was in accordance with law and according to the laws, usages, rules, and customs of the Seneca Nation of Indians. Turkey died on April 15, 1921, leaving no widow, child, or lineal descendant him surviving. When he died he had no relative, except the plaintiff Alexander John, who, as the bill avers, is the only surviving child of a Seneca Indian who was the brother of the mother of Turkey, and hence his only living heir and next of kin; that he died leaving a will devising his lands as follows: One-third thereof to the defendant Martha Seneca, and the remainder to Alexander John and Lorinda, his wife, and to their heirs and assigns forever. The bill then avers that the defendant Hattie Snow conspired with Martha Seneca and one Gordon (a Seneca Indian), who was surrogate of the Cattaraugus reservation, to deprive Alexander John and wife of their interest under the said will and testament by collusive methods, namely, by filing a petition with Gordon as surrogate for probate of the will, and procuring him to deny probate, though he was without power to legally act in the premises, and later to procure the issuance of letters of administration upon the estate of Hattie Snow; that such letters of administration were in fact issued by the defendant Button, who succeeded Gordon to the office of surrogate, or claimed to act in that capacity, and that Hattie Snow thereupon, under an "illegal and inequitable internal law or pretended internal law, rule, or regulation of said Seneca Nation of Indians"—laws or rules in contravention of the Constitution of the United States—claims to be vested with the fee of the real estate and property of Turkey, to which Alexander John and wife are lawfully entitled; that the Seneca population on both reservations is about 2,000, with a few Cayuga Indians domiciled with them.

It is next averred that the defendants threaten to evict and dispossess John and wife from the lands and premises rightfully occupied by them under the aforesaid last will and testament, and having no adequate remedy at law the defendants should be enjoined from dispossessing them until the determination of this action. The writ of subpoena and temporary injunction order were served on the defendants by the marshal of this court on the Cattaraugus Reservation, and all the defendants, without submitting themselves to the jurisdiction of this court, now suggest through their counsel that this court is without jurisdiction over them as tribal Indians and as a nation, or

over their domain, and the writ should be dismissed for lack of jurisdiction.

Defendants earnestly insist that the Indian tribes of the Seneca Nation are entitled to a de jure and de facto system of government on their domain in respect of their affairs under the law of nations of right, independent of the United States, and that the Six Nations are not amenable to judicial process without their consent.

It is true that in the early period in this country the federal courts dealt with tribal Indians as quasi nations by treaty, and it was stated at various times in judicial decisions that the land of the New York Indians was not held subject to any state or federal power; that they (the Mohawk Indians) are not amenable to our courts of justice (Jackson v. Hudson, 3 Johns. [N. Y.] 375, 3 Am. Dec. 500), and that protection and aid was promised them before the Revolutionary War and afterwards by the United States, without any limitation in their property or political rights; that it was agreed that land mentioned in the Seneca Treaty should belong to them absolutely in fee, and that the United States would not disturb them in their occupancy and possession, as appears by the Ft. Stanwix Treaty of 1784, and Ft. Harmer in 1789, and later in 1794 reaffirmed in part by the Canandaigua Treaty and by the treaties of 1838–1842. It is insisted that, regardless of previous acts of Congress and the decision of the Supreme Court in U. S. v. Kagama, 118 U. S. 377, 6 Sup. Ct. 1709, 30 L. Ed. 228, holding that, instead of controlling tribal Indians by treaties Congress has the right to govern them since they are inhabitants within the geographical limits of the United States (Act March 3, 1871 [16 Stat. 566]); that Congress has not yet legislated, nor has the Supreme Court of the United States as yet, in a Six Nations case, decided, that the national obligations assumed under treaty regulations and the protection guaranteed to the Senecas were annulled or rendered ineffectual.

Reliance is had on treaties that in terms and circumstances are materially different from treaties with other western and southern nations or tribes, and, on judicial decisions interpreting them. Worcester v. Georgia, 6 Pet. 515, 8 L. Ed. 483. Counsel assert that the Six Nation Indians have never agreed to submit to the United States laws, but, on the contrary, have constantly maintained their unlimited sovereignty in internal affairs; that they themselves interpret their treaties, and always have resisted usurpation of tribal rights; in short, that they have governed themselves, organizing a Peacemakers' and a Surrogates' Court, from whose decisions appeals may be taken to the Indian Councilors of the nation duly elected under the governmental organization, as they had a right specifically under section 46 of the Indian Law of the state of New York, and hence that this court is without jurisdiction to grant the relief sought.

The right of the United States, however, to enact criminal statutes for the protection of Indians domiciled on reservations and for the protection of persons with whom they have dealings is no longer open to question and requires no citation of authority (Criminal Code, § 328 [Comp. St. § 10502]); but whether this court, in the absence of

legislation by Congress, has the power to enjoin the disposal of lands to Indians belonging to the tribe, or to partition lands in possession of Indians domiciled on the reservation, or to interfere with the manner of possessing lands held in severalty or in common by them, or how it shall descend, or who shall take by inheritance, bequest, or devise under tribal laws, customs, and usages, is a question not free from difficulty. It must be admitted that from the earliest period their tribal semi-independence has been recognized and acquiesced in by the federal government. Worcester v. Georgia, supra. Indeed, it has been the general policy in this country to guarantee to Indian tribes or bands control of their domestic affairs, including jurisdiction in certain cases to punish crimes committed upon the reservation by an Indian against the person or property of another Indian (section 4149, Comp. St.), and generally to permit them to conform to their Indian customs and usages without interference. Under the constitutional power to regulate commerce with Indian tribes, Congress enacted suitable legislation prohibiting general interference with their affairs by whites. In the Kagama Case the Supreme Court stated that, although as nations the Indian tribes do not possess the full attributes of sovereignty, yet as a separate people they have the power to regulate their internal and social affairs unmolested until Congress passed legislation to limit their rights. "Thus far," the court said, "they have not been brought under the laws of the Union or of the state within whose limits they resided."

The government, however, claims that new customs, new forms and laws, have been passed by the Six Nations Council—a council that is controlled by a faction of the tribal Indians—and if such laws and customs are enforced it will result in unlawfully divesting individual Indians of their personal rights without adequate redress, through ill will or prejudice and fraud by the officials and councilors. It is argued by the United Sattes attorney that, since Indians are the wards of the United States, it is its duty as guardian to protect them as a tribe and in their individual rights, to the end that their lands and property be not illegally invaded or taken from them by illegal means and improper machinery of government.

No claim is made by the government to the lands described in the bill, or that it has a sovereign right of ownership or possession thereto; concededly the property right in fee simple of the Seneca Nation to the lands occupied by them on the Cattaraugus and Allegany Reservations until they voluntarily part with their possessions, which may be only, as herein pointed out, with the consent of the Congress of the United States. The control of Congress over the continued right of possession by the Indians under Act Feb. 19, 1875 (18 Stat. 330), was upheld by the state Supreme Court in Ryan v. Knorr, 19 Hun, 540, and Shongo v. Miller, 45 App. Div. 339, 61 N. Y. Supp. 281. In those cases the court substantially said that, even though Act Feb. 19, 1875, was in conflict with prior treaties, it operated to supersede them, and leases of lands previously made by the Seneca Nation of reserved lands were invalid. In Fellows v. Blacksmith, 19 How. 366, 15 L. Ed. 684, the authority of the United States

under treaty regulations to remove tribal bands of Senecas to western territories after relinquishing lands occupied by them in this state was sustained; but their forcible removal, the Supreme Court held, could only be had under the direction of the United States, and not by dispossess proceedings at law—something that was not contemplated by the treaty—and the court expressly refused to go behind the treaties to determine whether or not the Tonawanda tribe was properly represented at the council by its chiefs and head men in the negotiations and execution thereof. That bears significantly, I think, upon the question here, and would seem to confirm the view that federal courts are reluctant to interfere with the internal affairs of tribal Indians, and with the lands reserved to them for their occupancy, and with the lands subdivided among them under tribal laws.

In Jimeson v. Pierce, 78 App. Div. 9, 79 N. Y. Supp. 3, it was assumed that the Legislature of the state had the right to enact statutory laws providing that an Indian domiciled on the Cattaraugus Reservation possessed the capacity to acquire and hold in severalty and in fee simple lands upon the reservation under the laws of the state, and that the lands so held were subject to partition among the heirs at his death. The facts of that case are analogous to the facts here, and they will be understood by referring to the holding of the court, namely, that an Indian woman who had her dower set off to her by judgment of the Peacemakers', Court, and to whom possession was subsequently denied, had the right to maintain an action in the state Supreme Court to enforce the decree or judgment of the tribal court; and in Mulkins v. Snow, 106 Misc. Rep. 556, 175 N. Y. Supp. 541, it was determined that in the absence of congressional action the state Legislature may confer upon individual Indians of the tribe the right to come into state courts and litigate their controversies, since under Indian Law (Consol. Laws, c. 26) § 46, the Peacemakers' Court had jurisdiction of actions between Indians living on the reservation involving the title to real estate and their limited right to occupancy. These adjudications would seem to establish that John and wife are not without remedy, if action were brought for partition under the Indian Laws of the state. But compare decisions of Judge Woodward in People ex rel. Jimeson v. Shongo, 83 Misc. Rep. 325, 144 N. Y. Supp. 885, and Jimeson v. Lehley, 51 Misc. Rep. 352, 101 N. Y. Supp. 215.

As yet Congress has not authorized individual Indians or the tribe to come into the federal courts and litigate their controversies with other Indians in relation to questions of property rights held by them in severalty or as tenants in common, unless section 24 of the Judicial Code (Comp. St. § 991), conferred such right. The government attaches importance to the cases of Heckman v. U. S., 224 U. S. 415, 32 Sup. Ct. 424, 56 L. Ed. 820, and U. S. v. Boylan (D. C.) 256 Fed. 468, affirmed (C. C. A.) 265 Fed. 165, as showing that the United States may resort to federal courts sitting in equity to protect the Indians in their possessions. In these cases, however, it was held that the United States has the right to sue to enforce restrictions of the alienation of Indian lands to white persons, and (in the Heckman

Case) that no conveyance to citizens by allottee Indians of lands allotted to them within the restricted period was valid without first obtaining the consent of Congress.

The Boylan Case was an action brought on behalf of the Oneida Tribe of Indians by the United States, and there it was likewise held that white persons were prohibited from acquiring the lands of the Six Nations Indians because there was no law empowering the individuals of the tribe to sell or incumber their lands and the conveyance was held to be in violation of the national and state Constitutions. These restrictions on sales of Indian lands to outsiders, the court held, must first be removed by Congress before disposal of the lands of the Indians is permitted. The right of the United States, as guardian and protector of the Indians, to interfere on behalf of the Indians for the purpose of preventing the violation of the restrictions under which the lands are held, cannot be successfully questioned. See La Motte v. U. S., 254 U. S. 570, 41 Sup. Ct. 204, 65 L. Ed. ——, decided by the Supreme Court January 24, 1921, and Privett v. U. S., 255 U. S. ——, 41 Sup. Ct. 455, 65 L. Ed. ——, recently decided. The principle governing those adjudications was quite different from the principle governing the question here in controversy. There the rule did not extend to interference with internal affairs of Indians of their tribe, or with the right of the tribe to administer upon the estate of a deceased tribal Indian, and therefore such adjudications are not strictly applicable.

The jurisdiction of this court, however, is also urged under section 24 of the Judicial Code, which provides that the United States District Court shall have jurisdiction of all actions, suits, or proceedings involving the right of any person of Indian blood or descent of any allotment of land under any law or treaty. But this authorization, in my opinion, based upon a re-examination of the scope of the act, has no application to this case. The land in controversy came to Turkey, not by allotment made to him by the United States, but by division in severalty among the Senecas from the whole tribe. Moreover, by section 4206, Comp. St., the Senecas and other Indian tribes were expressly excluded from the operation of section 24 of the Judicial Code, which in my opinion is limited to allotments of land by the government to the Indians. Hence the case of Lay v. Parker, unreported (Indians), decided by me several years ago, must be considered as having been decided under a misapprehension.

It would serve no useful purpose to further discuss the various matters suggested in the brief, assigning additional reasons for refusing jurisdiction herein. My conclusion is that, in the absence of congressional action bestowing upon the individual Indians the right to litigate internal questions relating to their property rights in the federal courts, and conferring jurisdiction upon this court to determine such controversies, this court should not assume jurisdiction.

An order may be entered dismissing the bill.