**UNITED STATES ex rel. PIERCE et al. v. WALDOW, Sheriff.**

(District Court, W. D. New York. November 12, 1923.)

No. 2357.

**1. Habeas corpus ⚫45(2)—Federal court has discretion to discharge Indian held under state process.**

When an Indian, who is a ward of the nation, is restrained of his liberty by state process, a discretionary right exists in a federal court, growing out of such relationship, to inquire into the cause of detention, and to discharge the Indian if the evidence warrants.

⚫For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. Indians ⊛—32—Sovereignty of New York extends to making and enforcing of laws regulating rights and property of Seneca Indians on Cattaraugus reservation.**

The state of New York has authority to enact laws for the civil government and regulation of the internal affairs of the Seneca Indians residing on the Cattaraugus reservation, which authority it has exercised, with the acquiescence of the Indians and the federal government since 1849, and in the absence of congressional legislation a federal court will not interfere with the administration of such laws by the courts of the state.

Habeas Corpus. Proceeding by the United States, on relation of Sylvester J. Pierce and Walter S. Kennedy, against William F. Waldow, Sheriff of Erie County, N. Y. Writ dismissed.

Decker & Menzie, of Rochester, N. Y., and William J. Donovan, U. S. Atty., of Buffalo, N. Y., for relators.

Carl Sherman, Atty. Gen., of New York (Michael J. Montesano, Sp. Deputy Atty. Gen., of counsel), for respondent.

HAZEL, District Judge. The return of the sheriff substantially shows that one Patterson, a Seneca Indian of full blood, residing on the Cattaraugus Indian reservation, in this district, died possessed of houses and lands situate on the reservation. His widow, who is a white woman, and to whom he was married in July, 1899, by a justice of the peace of Perrysburg, and several children, his heirs at law and next of kin, survive him. He left a last will and testament, naming Alice Patterson executrix, which was admitted to probate by the surrogate of Erie county, and letters testamentary granted. Thereupon a Seneca Indian named Sylvester J. Pierce began suit in the Peacemakers' Court of the Cattaraugus Indian reservation, alleging that Patterson's widow and children were not members of the Seneca Nation, and were not entitled to inherit the real estate of the deceased under certain tribal customs, and letters of administration were issued to him under tribal custom. The executrix appeared in the Peacemakers' Court and objected to the jurisdiction, but the Peacemakers held otherwise and decreed that the lands of the deceased be surrendered to Ely S. Pierce and Sylvester J. Pierce after the removal of the growing crops, and that the widow be allowed the use of 2½ acres of land until April, 1923, following, at which time she was required to vacate the same. It is stated in argument that by rights of the ancient confederacy of the Iroquois adopted by the Seneca Nation and custom that Seneca Indians only who were born of tribal women could comprise membership in the tribe and that a widow of a Seneca Indian and half-breed children were considered white persons, and were incapable of taking title to lands left by a deceased Seneca Indian, either by will or inheritance.

The Supreme Court of this state, on application of the executrix, granted an alternative writ of prohibition and its three Peacemakers were required to show cause why the writ should not be made absolute and they be enjoined from taking further steps to enforce their decree. On the return day counsel appeared for the Peacemakers and re-

quested a continuance, but later they defaulted and the writ absolute was issued by the late Justice Marcus, and thereafter, upon showing that the Peacemakers' Court disobeyed the writ, the reservation marshal, who, under their authority, threatened to carry out the decree of dispossession, and Pierce, one of the claimants, were held in contempt and committed to the Erie county jail until they paid the costs and expenses of the prohibition proceeding. In execution of the commitment the sheriff of Erie county arrested both the reservation marshal and Pierce while they were temporarily in the federal building at Buffalo, invoking as wards of the nation the aid and protection of the United States attorney, but upon their apprehension they immediately applied to this court for a writ of habeas corpus which was granted by consent of the parties, and the Indians were released from arrest pending examination by this court of their legal rights. A hearing has now been had on the return and issues presented.

[1] The immediate point suggested by the Attorney General of this state, who appeared for the sheriff of Erie county and in vindication of the process, is that the writ be dismissed for lack of jurisdiction, and the relators left to their remedy in the state court, that court being competent to determine the alleged illegality of the restraint. This suggestion would be adopted by me, if it were not that existing circumstances are of such an unusual character that I feel confident that the mere issuance of the writ will not be regarded as an inappropriate interference with the authority of the state court, especially as Indians primarily are wards of the nation, and when restrained of their liberties by state process, a discretionary right exists, growing out of the relationship, to inquire into the cause thereof and to discharge them if the evidence so warrants.

In behalf of the relators it is pleaded that they have no money to bear the costs and expenses of proceedings for their protection in the state courts; that they are wholly unable to give the bonds required on appeal; and furthermore, that by treaty relations (Ft. Stanwix) in force between the Seneca Nation and the government they are assured of the protection of the federal courts. These considerations, then, have persuaded me that it would not be improper for me to examine into the merits of the proceeding without requiring the relators to continue seeking their liberty by appeal to review Judge Marcus' decision in the state court. I have heretofore, in U. S. v. Hamilton (D. C.) 233 Fed. 685, allowed a writ of habeas corpus on the application of an Indian under arrest for violation of the conservation laws of the state of New York (fishing in streams running through the Indian reservation) without objection to the jurisdiction by the Attorney General, and which in principle I think was different from the case at bar. See In re Blackbird (D. C.) 109 Fed. 139; U. S. ex rel. Standing Bear v. Crook, 25 Fed. Cas. 695, Case No. 14,891, where the right of Indians to a writ of habeas corpus by federal courts was recognized for relief from arrest on state process for violation of United States laws or of a treaty made in pursuance thereof.

Of course, the writ of habeas corpus cannot be made use of as a writ of error, and sight should not be lost of the fact that a state court

of original jurisdiction which has the parties before it may enforce and protect rights secured by the Constitution and the laws in pursuance thereof. Robb v. Connolly, 111 U. S. 637, 4 Sup. Ct. 544, 28 L. Ed. 542; Ex parte Royall, 117 U. S. 248, 6 Sup. Ct. 734, 29 L. Ed. 868; Eaton v. West Virginia, 91 Fed. 760, 34 C. C. A. 68. Inasmuch as questions frequently arise in this jurisdiction from the possession and occupancy by Indians of lands on the various reservations, I prefer to examine the merits of the present controversy rather than to relegate the relators back to the state court, without giving heed to their plea that in view of their pupilage their rights should be determined in this court. My decision, however, must of course be based upon legal principles as announced in prior adjudications.

[2] The paramount question, after all, is whether the Seneca Indians, remnants of the once powerful Six Nations, residing on the Cattaraugus reservation, are in fact, as they claim, outside of the geographical limits of the sovereignty of New York. There are numerous decisions in the courts of this state wherein the right of occupancy and possession and legal status of the Seneca Indians are ably and exhaustively discussed. In all of them it has been unequivocally held that, notwithstanding their pupilage and disabilities arising therefrom, the sovereignty of the state of New York attaches to their lands comprised within its boundaries, Seneca Nation of Indians v. Christie, 126 N. Y. 122, 27 N. E. 275; and to direct their affairs, Hatch v. Luckman, 155 App. Div. 765, 118 N. Y. Supp. 689, 140 N. Y. Supp. 1123; and widow may bring action to enforce judgment of Peacemakers' Court, Jimeson v. Pierce, 78 App. Div. 9, 79 N. Y. Supp. 3; and that power to legislate for Indians must yield to paramount authority of federal government, People ex rel. Cusick v. Daly, 212 N. Y. 183, 105 N. E. 1048, Ann. Cas. 1915D, 367. That both the federal and state governments at various times in the past made treaties with the Indians is unquestionable, though the paramount authority of the federal government over them is generally conceded, but the government has frequently recognized the right of the state to deal with Indians within its boundary.

In Benson v. U. S. (C. C.) 44 Fed. 178, Judge Wallace, in speaking of the right of this state to exercise sovereignty over tribal Indians, said that since 1858 New York has always exercised its sovereign powers within the reservation, and that in New York v. Dibble, 21 How. 366, 16 L. Ed. 149, the Supreme Court of the United States decided that it has a right so to do, "so far as necesary to protect the property and persons of Indians in this state and to preserve the public peace."

The Seneca Nation of Indians in 1848, in a convention at the Council House on the Cattaraugus reservation, adopted a Constitution, wherein they pathetically acknowledged that their then existing civil conditions failed to answer the purpose for which all governments should be created; that it afforded to them no security and enjoyment of property, nor laws regulating the institution of marriage. They invoked the government of the United States and the state of New York to aid them in providing laws under which the existing evils

growing out of their tribal system might be eliminated,[1] and in their charter their chiefs or council were authorized to make laws not inconsistent with the Constitution of the United States or of the state of New York. The Legislature, acting upon their request, in March, 1849, assented, and from then on at different times numerous laws for their civil government and regulation of their internal affairs were passed. A Peacemakers' Court was established, which was empowered to determine actions between individual Indians residing on the reservation and questions relating to the title to real property (see chapter 229, Laws 1893, amending earlier provisions), but, being an inferior statutory court, was not given equity jurisdiction (article 6, § 18, State Constitution; People v. Johns, 80 Misc. Rep. 418, 141 N. Y. Supp. 225).

In Jimeson v. Pierce, 78 App. Div. 9, 79 N. Y. Supp. 3, it was said that the Indians "are regarded as wards of the state, and possess such rights to appear and litigate in courts of justice as are conferred upon them by statute." And in Hatch v. Luckman, supra, affirmed 155 App. Div. 765, 118 N. Y. Supp. 689, Judge Wheeler, in a case arising over lands on the Tonawanda reservation in this district, said:

"The state from time immemorial has assumed to control and direct their affairs and legislate in reference to them, and its authority so to do has never been doubted or questioned. Where the Indians assert any peculiar rights or privileges, they must find authority for them in the legislation and laws of the state, and not by reason of their peculiar customs, or tribal existence from immemorial times. Such sovereignty as they formerly possessed, we think it may be safely asserted, has at this time been merged and lost in the greater sovereignty of the state under which they must look for protection of life and property."

The opinion also states that, as the Indians of this state had advanced in intelligence, education, and civilization, he could see no reason why the common law of the land should not apply and govern them and their affairs, save as special exemptions and privileges may have been conferred growing out of their wardship to the state. By section 7 of the Indian Law of this state (Consol. Laws, c. 26), relating to partition of tribal lands, it is stated that lands occupied as the

---

[1] "We, the people of the Seneca Nation of Indians, by virtue of the right inherent in every people, trusting in the justice and necessity of our undertaking, and humbly invoking the blessing of the God of Nations upon our efforts to improve our civil condition, and secure to our nation the administration of equitable and wholesome laws, do hereby abolish, abrogate and annul our form of government by chief, because it has failed to answer the purpose for which all governments should be created. It affords no security in enjoyment of property, it provides no laws regulating the institution of marriage, but tolerates polygamy. It makes no provision for the poor, but leaves the destitute to perish. It leaves the people dependent on foreign aid for education. It has no judiciary, nor executive departments. It is an irresponsible, self-constituted aristocracy. Its powers are absolute and unlimited in assigning away the people's rights, but indefinite and not exercised in making municipal regulations for their benefit or protection. We cannot enumerate the evils growing out of a system so defective, nor calculate its overpowering weight on the progress of improvement. But to remedy these defects, we proclaim and establish the following Constitution or charter, and implore the governments of the United States and the state of New York to aid in providing us with laws under which that shall be possible."

common property of the tribe may be divided by the Indian government "among the individuals and families of such nation, tribe or band, so that the same may be held in severalty and in fee simple, according to the laws of this state." Although counsel for relators contends that the question of what the Indians intend doing with the land of the deceased is not before me for consideration, yet it nevertheless appears clearly from the return and concessions at the hearing that the Peacemakers' Court decreed that the widow and heirs of Patterson were not entitled to inherit his real estate, and, furthermore, that the claim of Pierce to letters of administration by virtue of the tribal customs and regardless of state laws was sustained.

In Seneca Nation of Indians v. Jamison, Mr. Justice. Daniels, of the Supreme Court of the state (opinion unreported), had before him a similar question, to wit, that children of an Indian father by a white woman could not inherit under tribal custom, and he substantially held that, as the deceased had the right of occupancy secured to him under the statute by the action of the Indian council, the setting the land apart secured the same, not only to him, but also to his family. It made no difference, the learned court said, whether the family was of the whole blood of the Indian Nation or only of the half blood; that the family was entitled to be protected in the use and enjoyment of the property. Chapter 228, Laws 1843; chapter 150, Laws 1845; 2 R. S. (6th Ed.) p. 1053, § 88; Angell on Limitations (3d Ed.) § 380; Seneca Nation of Indians v. Lekly, 55 Hun, 83, 8 N. Y. Supp. 245.

In U. S. v. Seneca Nation of Indians (D. C.) 274 Fed. 947, this court held that in the absence of congressional legislation federal courts would not assume jurisdiction of litigation relating to the rights of property on the Cattaraugus reservation, and that in the absence of congressional action the state Legislature had the right to confer upon individual Indians of the tribe the right to come into state courts and litigate their controversies. Consol. Laws, c. 26, § 46. Moreover, that the Peacemakers' Court has jurisdiction of actions between Indians living on the reservation involving title to real estate and their limited right to occupancy, and that the plaintiffs in that case, who were Indians seeking to recover lands taken from them by the Peacemakers, were not without remedy if actions were brought in the state court for partition under the Indian laws of the state.

Counsel for the relators does not dispute the effect of these decisions, but notwithstanding long acquiescence broadly contends that the Constitution of the Seneca Indians does not warrant the exercise of any state sovereignty over their territory and over the lives and property of their people; that the state imposed its sovereignty and will upon the Seneca Nation; that notwithstanding interference by the Legislature of the state the Seneca Nation has consistently maintained and exercised sovereignty within its territory as to its internal affairs; that the charter empowering the Seneca Nation to make laws not inconsistent with the laws of the United States and of the state of New York is to be interpreted by the Seneca Nation, and not by any tribunals of the state or of an alien people. But these arguments and contentions are overcome by state statute and decisions to which refer-

ence has been made. Tribal Indians have never been regarded as nations or states. They have merely been accorded some of the attributes of sovereignty, Cherokee Nation v. Georgia, 5 Pet. 1, 8 L. Ed. 25; a semi-independent people while living in tribal relations, a separate people, as said in U. S. v. Kagama, 118 U. S. 382, 6 Sup. Ct. 1113, 30 L. Ed. 228, "with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the state within whose limits they reside." As to heinous crimes committed on their reservations, the laws of the United States apply to them, and as to their civic relations to individual Indians occupying lands on the reservation by allotment or set-off they have, since 1849, been brought under the law of this state, and by their charter from this state the Senecas have bound themselves to embody no laws inconsistent with state and federal laws.

Importance is attached to U. S. v. Boylan, 265 Fed. 165, wherein it was held by the Circuit Court of Appeals, Second Circuit, Judge Ward dissenting, that the Oneida Indians occupying lands within this state under a treaty with the state constituted a distinct tribe or nation, and that exclusive jurisdiction over them was vested in the federal government which had a right to maintain actions in that behalf. It was also held that there is no federal legislation authorizing an Oneida Indian to mortgage his property on the reservation to an outsider and hence a mortgage given by him was invalid. The decision is based upon the fact that Congress has enacted legislation relating to the disposition of Indian property and that a valid conveyance could only be made with its consent in view of congressional restrictions upon the sale of their lands. The inapplicability of that decision to this case I think is clear. Until Congress points out a different course, I conceive it to be my duty to follow the repeated decisions of the state tribunals, including the highest court of the state, on questions involving the civil affairs of the Seneca Indians on the Cattaraugus reservation, which by long acquiescence on their part have become rules of property within this state.

The writ must be dismissed on the merits; and it is so ordered.