57 Wn.2d 181 (1960)
356 P.2d 985
THE STATE OF WASHINGTON, on the Relation of Irene Adams, Relator,
v.
THE SUPERIOR COURT FOR OKANOGAN COUNTY, Joseph Wicks, Judge, Respondent.[1]
No. 35457.
The Supreme Court of Washington, En Banc.
October 20, 1960.
Kelly Hancock, for relator.
John Hancock, R.E. Young, The Attorney General, Fred C. Dorsey and Jane Dowdle Smith, Assistants, for respondent.
HUNTER, J.
This is a review by certiorari of an order of the Juvenile Court for Okanogan County wherein the court declared relator's four minor children, dependent children; permanently deprived the parents of their custody and made them wards of the court subject to placement for adoption.
The children are enrolled members of the Colville Indian Tribe, and they resided, at all times material to this review, on a Colville Indian allotment to which the United States held title. The allotment is located on what is known as the south half of the diminished Colville Indian Reservation.
The sole issue for determination on this review is whether the Juvenile Court for Okanogan County had jurisdiction over the said minor children.
The relator contends that the jurisdiction of the federal government over Indian tribes and enrolled members of such tribes, while they are on Indian reservations, is exclusive. We agree.
*183 When the United States began its existence as a nation, the Indian tribes of North America were independent sovereign nations. The constitution gave to the federal government exclusive jurisdiction in the field of international affairs. In dealing with the Indians the federal government acted under the power to make war and rules concerning capture, the treaty power, and the commerce power. In Worcester v. Georgia, (1832 U.S.) 6 Pet. 515, 8 L.Ed. 483, the United States Supreme Court acknowledged the extent of these congressional powers as they relate to Indian affairs:
"[The constitution of the United States] confers on Congress the powers of war and peace; of making treaties, and of regulating commerce with foreign nations, ... and with the Indian tribes. These powers comprehend all that is required for the regulation of our intercourse with the Indians...."
As our nation expanded, ever fewer Indian tribes retained their independent sovereignty; most of the tribes became dependent wards of the federal government. In 1871, by congressional enactment, it was declared that no Indian tribe or nation would be thereafter recognized as an independent nation with whom the United States would contract by treaty. This act did not affect the federal government's exclusive jurisdiction over the Indian tribes, but was only a decision to govern its Indian wards by congressional enactment rather than by treaty. United States v. Kagama, 118 U.S. 375, 30 L.Ed. 228, 6 S.Ct. 1109 (1886).
[1] The argument is made that although the federal government has plenary power over the Indians this power requires an express enactment, and where Congress has remained silent the power remains with the states. The historical circumstances, which made exclusive federal jurisdiction over the Indians necessary, preclude any notion of residual state powers. These circumstances were most aptly recounted in 1886 by Mr. Justice Miller in United States v. Kagama, supra:
"... These Indian tribes are the wards of the nation. They are communities dependent on the United States. *184 Dependent largely for their daily food. Dependent for their political rights. They owe no allegiance to the States, and receive from them no protection. Because of the local ill feeling, the people of the States where they are found are often their deadliest enemies. From their very weakness and helplessness, so largely due to the course of dealing of the Federal Government with them ... there arises the duty of protection, and with it the power. This has always been recognized by the Executive and by Congress, and by this court, whenever the question has arisen.
"...
"The power of the General Government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection ... It must exist in that government, because it never has existed anywhere else, because the theatre of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes." (Italics ours.)
In a long line of cases beginning with Worcester v. Georgia, supra, and continuing to the recent decision of Williams v. Lee, 358 U.S. 217, 3 L.Ed. (2d) 251, 79 S.Ct. 269 (1959), the United States Supreme Court has recognized the exclusive jurisdiction of Congress over the affairs of enrolled Indians on Indian reservations.
Any remaining doubt concerning the existence of state jurisdiction is dispelled by the enactment by Congress, August 15, 1953, of Public Law 280 (67 Stat. 588, 590), and the action of the Washington State Legislature pursuant thereto. Public Law 280 is designed to end the federal government's responsibility toward the Indians by consenting to an affirmative assumption of civil and criminal jurisdiction by the states. Section 7 reads as follows:
"The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof."
Pursuant to this enactment the Washington State Legislature enacted Laws of 1957, chapter 240 (RCW 37.12), *185 wherein this state agreed to assume jurisdiction upon the request of the tribal council of any Indian tribe, community, or group involved; and in the case of the Colville, Yakima, and Spokane tribes or reservations only if such request has been ratified by a two-thirds majority of all the adult enrolled members of the tribe. The effect of RCW 37.12 was discussed in In re Arquette v. Schneckloth, 56 Wn. (2d) 178, 351 P. (2d) 921 (1960):
"The statute does not vest state courts with civil and criminal jurisdiction over Indians on Indian reservations; it only gives the tribal council, or other governing body, the right to petition the governor for the issuance of a proclamation placing the people and lands of the tribe under civil and criminal jurisdiction of the state...."
[2] The confederated tribes of the Colville Indian Reservation have not elected to place themselves under the operation of RCW 37.12; until they do so, or the legislature unconditionally assumes jurisdiction, as authorized by Public Law 280, the courts of this state will have no jurisdiction beyond that expressly granted by Congress. There remains then the question of whether the Juvenile Court for Okanogan County obtained jurisdiction over these minor children by reason of any specific congressional enactments.
[3] It is contended by the respondent in the instant case that by the enactment of Public Law 414 on June 27, 1952 (66 Stat. 235), making Indians, Eskimos, and Aleutian Islanders nationals and United States citizens, these minors are entitled to equal protection of the laws of the state of Washington. We are only concerned here with the enactment's effect in authorizing the state courts to exercise jurisdiction over Indians who reside upon a reservation under the exclusive control of the federal government. We find nothing in the language of this enactment conferring such jurisdiction upon the states. Giving it such a construction would be inconsistent with § 16 of the Reorganization Act of June 18, 1934 (48 Stat. 984), giving Indian tribes the right to establish constitutions and bylaws for their own self-government, subject to the approval of the Secretary of the Interior.
*186 [4] It is further contended by the respondent that, by reason of the Law and Order Code enacted by the confederated tribes of the Colville Indian Reservation pursuant to the act of June 18, 1934, concurrent jurisdiction in domestic relations has been conferred upon the state courts. In support of this contention, respondent cites § 1 of chapter 3, which provides:
"Marriage and Divorce
"The Colville Tribal Court shall have jurisdiction over the Domestic Relations of the members of the tribe. Such jurisdiction running concurrently with State authority as applicable."
However, other parts of the code must be considered in construing the meaning of this section: Chapter 3, § 4, deals with "Determination of Paternity and Support"; chapter 4, § 4, deals with "Juvenile Delinquency"; chapter 5, § 33, deals with "Failure to send children to school"; chapter 5, § 34, deals with "Contributing to the Delinquency of a Minor."
An examination of these sections, which deal with other areas of domestic relations, discloses no reference to concurrent jurisdiction running with the state. If there was an intention that the state have such jurisdiction in these fields of domestic relations, as provided in the section entitled "Marriage and Divorce," it would have been so stated. Therefore, we hold the jurisdiction referred to in chapter 3, § 1, is limited to marriage and divorce, and the Okanogan county juvenile court received no jurisdiction by reason of this section of the Law and Order Code.
[5] Respondent contends the juvenile court has jurisdiction by reason of 25 USCA § 372a (1959), which reads:
"In probate matters under the exclusive jurisdiction of the Secretary of the Interior, no person shall be recognized as an heir of a deceased Indian by virtue of an adoption 
"(1) Unless such adoption shall have been 
"(a) by a judgment or decree of a State court;
"(b) by a judgment or decree of an Indian court; ..."
This section does not authorize a state juvenile court to declare minor Indian children, over which the federal government *187 has exclusive jurisdiction, to be dependent children, or to permanently deprive parents of their children's custody. Nor is such an exercise of jurisdiction necessary for a decree of adoption to be entered by a state court. The juvenile court therefore acquires no jurisdiction by reason of this enactment.
[6] Respondent contends that to administer the Social Security Act, Title IV, 49 Stat. § 402(a), providing that the state plan for aid to dependent children, makes it essential that the juvenile court take jurisdiction in certain cases and declare children "dependent children" before aid can be administered. We disagree. An examination of the Social Security Act discloses that "a dependent child" as defined therein, is not "a dependent child" as defined in the State Juvenile Court Act. RCW 13.04.010.
Under our juvenile court act, "a dependent child" must be so determined by order of the juvenile court. Under the Social Security Act, a child need not be determined "a dependent child" by the order of any court to come within the definition as provided in the act. 42 USCA (1952 ed.) § 606 provides:
"...
"(a) The term `dependent child' means a needy child under the age of eighteen, who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepmother, stepbrother, stepsister, uncle, aunt, first cousin, nephew, or niece, in a place of residence maintained by one or more of such relatives as his or their own home; ..."
This definition has been adopted by our state in Laws of 1937, chapter 114, § 1, p. 452, RCW 74.12.010, and is clearly unrelated to the definition of "a dependent child" found in our Juvenile Court Act. The juvenile court therefore received no jurisdiction by reason of the federal Social Security Act, or by our statutes enacted pursuant to adopting and carrying out the federal social security program.
[7] The respondent further contends the juvenile court has jurisdiction of the minor children by reason of 25 *188 USCA § 231 (1959), which states:
"Enforcement of state laws affecting health and education; entry of state employees on Indian lands.
"The Secretary of the Interior, under such rules and regulations as he may prescribe, shall permit the agents and employees of any State to enter upon Indian tribal lands, reservations, or allotments therein (1) for the purpose of making inspection of health and educational conditions and enforcing sanitation and quarantine regulations or (2) to enforce the penalties of State compulsory school attendance laws against Indian children, and parents, or other persons in loco parentis except that this subparagraph (2) shall not apply to Indians of any tribe in which a duly constituted governing body exists until such body has adopted a resolution consenting to such application."
The jurisdiction of the state to make inspection for health and educational conditions and enforcing sanitation and quarantine regulations clearly relates to the health and sanitation of a community and does not confer any jurisdiction upon the juvenile court over individual children. Moreover, it is not within the province of the juvenile court to make inspections or to enforce general health and sanitation regulations.
Subsection (2) of § 231, supra, relating to compulsory school attendance is immaterial to our determination of the instant case, since the record discloses the confederated tribes of the Colville Indian Reservation have not consented to the application of our state compulsory school attendance law, as required by subsection (2).
[8] The respondent contends that the minors, at the time of their detention, were residing on an Indian allotment which was not a part of the reservation, and therefore the exclusive jurisdiction of the federal government over Indians on reservations cannot apply. We disagree. The record discloses title to the allotment upon which the children resided was in the United States government. The government had exclusive jurisdiction and control over such lands, as provided in the compact clause of our state constitution. Art. XXVI. Moreover, the presidential proclamation of May 3, 1916, opening the south half of the *189 diminished Colville Indian Reservation for settlement pursuant to the homestead laws of the United States, specifically excepted reserved and allotted lands. The exercise of exclusive jurisdiction of the federal government over these excepted lands was in no way disturbed by the proclamation. We find no distinction in the exercise of control over Indians by the federal government whether they reside on an Indian reservation or on an Indian allotment as in the instant case.
The Okanogan county juvenile court was without jurisdiction to enter the dependency and deprivation order. The order is therefore reversed.
WEAVER, C.J., DONWORTH, ROSELLINI, OTT, and FOSTER, JJ., concur.
MALLERY, J., dissents.
HILL, J. (concurring in part; dissenting in part)
Inasmuch as our federal government is a government of granted powers, it is necessary to find somewhere within the constitution the basis and the extent of its jurisdiction over the affairs of enrolled Indians on Indian reservations.
The constitution made two references to Indians: once with reference to the basis of apportionment of representatives and direct taxes (in Art. I, § 2),
"... which shall be determined by adding to the whole number of free persons, ... and excluding Indians not taxed, three-fifths of all other persons...."
(By § 2 of the fourteenth amendment this was modified by omitting "three-fifths of all other persons," and representation was apportioned
"... among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed....");
again, by Art. I, § 8, the Congress is granted power "To regulate commerce with foreign nations, and among the several states, and with the Indian tribes."
Chief Justice Marshall, in Worcester v. Georgia (1832), 31 U.S. 515, 8 L.Ed. 483, recognized that the power of *190 regulation and control by the federal government of the Indian tribes must be found within the constitution. He puts his conclusion on that matter in two sentences (p. 559):
"That instrument [the constitution] confers on congress the powers of war and peace; of making treaties, and of regulating commerce with foreign nations, and among the several states, and with the Indian tribes. These powers comprehend all that is required for the regulation of our intercourse with the Indians...."
This is the basic authority for all that has followed. The opinion of the great Chief Justice quotes at length from the treaties with the Cherokees and emphasizes their exclusive physical control over the territory occupied by them. By the fifth article of one of the treaties, the Cherokees allow the United States a road through their country; the ninth article forbids (p. 556) "any citizen of the United States to hunt on their lands, or to enter their country without a passport." The opinion states (p. 556):
"This treaty, thus explicitly recognising the national character of the Cherokees, and their right of self-government; thus guarantying their lands; assuming the duty of protection, and, of course, pledging the faith of the United States for that protection; has been frequently renewed, and is now in full force...."
The decision is based upon the treaty-making power and says that a citizen of Vermont (a missionary residing in the Cherokee country with the consent of the Cherokee nation) is not amenable to a Georgia statute which required a license or permit from the Governor of that state to reside in their territory, for the reason that the Cherokees had, under the treaties, the exclusive right to determine who should live in the territory occupied by them.
Mr. Justice McLean filed a separate opinion which took a much longer look into the future than did that of the Chief Justice. In it he says (p. 592):
"It will scarcely be doubted by any one, that, so far as the Indians, as distinct communities, have formed a connection with the federal government, by treaties; that such connection is political, and is equally binding on both *191 parties. This cannot be questioned, except upon the ground, that in making these treaties, the federal government has transcended the treaty-making power. Such an objection, it is true, has been stated, but it is one of modern invention, which arises out of local circumstances; and is not only opposed to the uniform practice of the government, but also to the letter and spirit of the constitution.
"But the inquiry may be made, is there no end to the exercise of this power over Indians, within the limits of a state, by the general government? The answer is, that, in its nature, it must be limited by circumstances. If a tribe of Indians shall become so degraded or reduced in numbers, as to lose the power of self-government, the protection of the local law, of necessity, must be extended over them. The point at which this exercise of power by a state would be proper, need not now be considered; if, indeed, it be a judicial question. Such a question does not seem to arise in this case. So long as treaties and laws remain in full force, and apply to Indian nations, exercising the right of self-government, within the limits of a state, the judicial power can exercise no discretion in refusing to give effect to those laws, when questions arise under them, unless they shall be deemed unconstitutional. The exercise of the power of self-government by the Indians, within a state, is undoubtedly contemplated to be temporary. This is shown by the settled policy of the government, in the extinguishment of their title, and especially, by the compact with the state of Georgia. It is a question, not of abstract right, but of public policy. I do not mean to say, that the same moral rule which should regulate the affairs of private life, should not be regarded by communities or nations. But a sound national policy does require, that the Indian tribes within our states should exchange their territories, upon equitable principles, or eventually consent to become amalgamated in our political communities. At best, they can enjoy a very limited independence within the boundaries of a state, and such a residence must always subject them to encroachments from the settlements around them; and their existence within a state, as a separate and independent community, may seriously embarrass or obstruct the operation of the state laws. If, therefore, it would be inconsistent with the political welfare of the states, and the social advance of their citizens, that an independent and permanent power should exist within their limits, this power must give way to the greater power which surrounds it, or seek its *192 exercise beyond the sphere of state authority.
"This state of things can only be produced by a co-operation of the state and federal governments. The latter has the exclusive regulation of intercourse with the Indians; and so long as this power shall be exercised, it cannot be obstructed by the state. It is a power given by the constitution, and sanctioned by the most solemn acts of both the federal and state governments; consequently, it cannot be abrogated at the will of a state. It is one of the powers parted with by the states, and vested in the federal government. But if a contingency shall occur, which shall render the Indians who reside in a state, incapable of self-government, either by moral degradation, or a reduction of their numbers, it would undoubtedly be in the power of a state government, to extend to them the aegis of its laws. Under such circumstances, the agency of the general government, of necessity, must cease. But if it shall be the policy of the government, to withdraw its protection from the Indians who reside within the limits of the respective states, and who not only claim the right of self-government, but have uniformly exercised it; the laws and treaties which impose duties and obligations on the general government should be abrogated by the powers competent to do so. So long as those laws and treaties exist, having been formed within the sphere of the federal powers, they must be respected and enforced by the appropriate organs of the federal government."
Later in his opinion Mr. Justice McLean emphasizes that the Cherokee treaties were the basis of the decision in that case (p. 594):
"It has been shown, that the treaties and laws referred to come within the due exercise of the constitutional powers of the federal government; that they remain in full force, and, consequently, must be considered as the supreme laws of the land. These laws throw a shield over the Cherokee Indians. They guarantied to them their rights of occupancy, of self-government, and the full enjoyment of those blessings which might be attained in their humble condition. But by the enactments of the state of Georgia, this shield is broken in pieces  the infant institutions of the Cherokees are abolished, and their laws annulled...."
It is to be noted, too, that the very recent case of Williams v. Lee (1959), 358 U.S. 217, 3 L.Ed. (2d) 251, 79 *193 S.Ct. 269, involves not only the power given under the constitution to regulate commerce with the Indian tribes, but the treaty terms with the Navajos, a tribe which has long exercised an exclusive jurisdiction over its territory and people, based upon those treaties. The court said (p. 221):
"... Implicit in these treaty terms, as it was in the treaties with the Cherokees involved in Worcester v. Georgia, was the understanding that the internal affairs of the Indians remained exclusively within the jurisdiction of whatever tribal government existed. Since then, Congress and the Bureau of Indian Affairs have assisted in strengthening the Navajo tribal government and its courts. See the Navajo-Hopi Rehabilitation Act of 1950, § 6, 64 Stat. 46, 25 U.S.C. § 636; 25 CFR §§ 11.1 through 11.87NH. The Tribe itself has in recent years greatly improved its legal system through increased expenditures and better-trained personnel. Today the Navajo Courts of Indian Offenses exercise broad criminal and civil jurisdiction which covers suits by outsiders against Indian defendants...."
Justice Black's opinion in that case must be interpreted within the framework of the factual situation before the court.
We are concerned with an entirely different treaty, an entirely different type of reservation, and an entirely different problem.
We are not here concerned with the imprisonment of Indians by state courts for offenses over which specific federal statutes say the federal courts have exclusive jurisdiction, as in In re Wesley v. Schneckloth (1959), 55 Wn. (2d) 90, 346 P. (2d) 658, and companion cases. No. one is trying to punish, collect from, or impose on an Indian.
In the present case the trial court was concerned with the extent to which, under the circumstances here existing, these four Indian children were entitled to the rights and benefits which non-Indian children, in similar circumstances, were entitled to receive.
We have here four children, abandoned by their fathers, who have been removed from the possession of a filthy, drunken and neglectful mother (as the record discloses the *194 relator in this case to be), and who have been supported by the State Department of Public Assistance since January 3, 1958. Were these children not enrolled members of an Indian tribe, no one would question the jurisdiction of the Juvenile Court for Okanogan County to regard them as dependent children (RCW 13.04.010), or their right to protection as such.
Being an enrolled member of an Indian tribe carries with it certain rights, benefits, and privileges  some guaranteed by treaties, others by federal statutes  and with these I would in no wise interfere.
Being citizens of the United States and of the state of Washington, as these children are (Act of June 2, 1924, 43 Stat. 253, 8 U.S.C.A., § 3 (now included in 8 U.S.C.A., § 1401)), entitled them to certain rights, benefits, and privileges. They come under the aegis of the laws of the state designed for their protection, unless there is something in their status as enrolled members of an Indian tribe which deprives them of the protection that other children are entitled to receive. Neither their tribe nor their mother is here saying that the children are not entitled to the care which the State Department of Public Assistance is giving them.
The issue is not, as the majority says, whether the Juvenile Court for Okanogan County has jurisdiction over the said minor children and could make provision for their care as dependent children (which they clearly are), but whether that court could deprive their mother of all parental rights and make the children subject to placement for adoption without her consent; and the opinion should be limited to that issue.
Mr. Justice McLean pointed out that (Worcester v. Georgia, supra), for the benefit of the Indians there must be (p. 594),
"... a co-operation of the state and federal governments. The latter has the exclusive regulation of intercourse with the Indians; and so long as this power shall be exercised, it cannot be obstructed by the state...."
*195 But he further pointed out that where that power is not exercised (p. 594),
"... it would undoubtedly be in the power of a state government, to extend to them [the Indians] the aegis of its laws...."
So far as the physical care of these children is concerned, the state obstructs neither the federal government nor the tribe. It acts in the vacuum created by their failure to act and extends to these children "the aegis of its laws."
The relationship of parent and child, within the tribe, is a different matter; and it may well be that the court acted beyond its authority in its order depriving the relator of all parental rights and depriving her of any right to be heard in the matter of their adoption.
I dissent from so much of the majority opinion as would indicate that our courts cannot take jurisdiction of Indian children, for their physical protection, where neither the parents, the tribe, nor the federal government is willing to do so.
FINLEY, J., concurs with HILL, J.
NOTES
[1] Reported in 356 P. (2d) 985.