[No. 44120.    En Banc.    November 4, 1976.]

*In the Matter of the Adoption of* DANIEL KEITH DUCKHEAD BUEHL.

PATRICIA DUCKHEAD, *Petitioner,* v. ROBERT L. ANDERSON, ET AL, *Respondents.*

650

*Allen Sanders* of *Legal Services Center* (Seattle) and *Joan Andersen,* for petitioner.

*Sidney J. Strong* and *Halverson, Strong, Moen & Chemnick,* for respondents.

*Michael Taylor* on behalf of the Blackfeet Tribe and *Bruce Thompson* and *Daniel A. Raas* on behalf of the Quinault Indian Nation, amici curiae.

UTTER, J.—Patricia Duckhead and her son, Daniel Duckhead Buehl, are enrolled members of the Blackfeet Tribe of the Blackfeet Indian Reservation in Montana. In 1974, the Blackfeet Tribal Court placed Daniel in the temporary foster care of Robert and Theda Anderson, residents of Washington. The tribal court subsequently ordered the return of the child to the natural mother. The Andersons refused to comply with the court order and instituted adoption proceedings in King County Superior Court. The court assumed jurisdiction of the matter but then dismissed the action, holding that the tribal court order was entitled to full faith and credit. Patricia Duckhead then petitioned the King County Superior Court for a writ of habeas corpus. Another department of that court held the tribal court decree was not entitled to full faith and credit and ruled there should be an independent determination of custody by a court of this state. Appeals from both rulings were consolidated. The fundamental issue presented is the extent to which an Indian tribe, located in another state, retains authority over its children, free from interference by the courts of this state.

I

The stipulated record and agreed statement of facts submitted by the parties reveal the following. As an enrolled member of the tribe, petitioner-appellant Patricia Duckhead has lived her entire life on or near the Blackfeet Indian Reservation, located within the exterior boundaries

of Montana. She is the natural mother of Daniel, also an enrolled member of the tribe. Robert Anderson is a member of the Blackfeet Tribe and his wife, Theda, is an enrolled member of the Shoshone-Bannock Tribe. The Andersons, respondents in this matter, reside in Seattle, Washington.

On September 6, 1973, Daniel, aged 8 months, was taken into the "temporary protective custody" of the Blackfeet Tribal Court. The court arranged care for the child with supervisory assistance from the Glacier County Welfare Department. Subsequently, Tribal Court Judge Howard Doore contacted the Andersons about their interest in assuming foster care of Daniel. On March 20, 1974, Judge Doore ordered the child placed with the Andersons "for the Period of one (1) Year, probationary, for his Health, Education, and Welfare. The natural mother may petition after six (6) months for custody." Courtesy supervision was provided by the Washington Department of Social and Health Services, which was asked to license this foster placement. The following day, the Andersons signed a document, presented by Judge Doore and signed by the clerk of the tribal court, stating that the Andersons "agree to return Daniel . . . to the Blackfeet Indian Reservation, Browning, Montana, if his natural mother, Patricia Duckhead Buehl, petition the Blackfeet Tribal Court."

The mother did petition the tribal court for a hearing on custody, held before Tribal Court Judge John Sharp on December 17, 1974. The court found that "the welfare reports and the testimony of the two county welfare workers . . . show that unquestionably Patricia Duckhead has made a remarkable recovery and that she presently is fit and able to care for her child." The court also found it was in the best interest of the child to be returned to his natural mother and so ordered. The Andersons were notified of the order but refused to release Daniel. This litigation followed.

The Blackfeet Tribe is a self-governing Indian tribe, organized under the Indian Reorganization Act of 1934, 25 U.S.C. § 461 *et seq.* (1970), and recognized as such by the

Secretary of the Interior. The 1934 act is a "statute specifically intended to encourage Indian tribes to revitalize their self-government." *Fisher v. District Court,* 424 U.S. 382, 47 L. Ed. 2d 106, 96 S. Ct. 943, 946 (1976). Pursuant to the Blackfeet Constitution, the tribe maintains a court system consisting of a trial court and appellate court of five justices. The former is composed of a small claims court, a traffic court, a juvenile court, and a general civil and criminal tribal court. All actions, with the exception of those in small claims court, are brought in the name of the Blackfeet Tribal Court. The tribe operates under its own set of laws, ordinances, and resolutions, adopted by the governing Tribal Business Council. The pertinent juvenile code provisions are found in chapter 7 of the Blackfeet Tribal Law and Order Code of 1967, as amended.[1] We hold the Blackfeet Tribal Court, acting according to its tribal laws and customs, has exclusive jurisdiction to determine whether a Blackfeet Indian mother is to retain custody of her child.

II

■ The relationship of Indian tribes with the several states of the Union has a long and complex history. *See generally* U.S. Department of the Interior, *Federal Indian Law* (1958); Canby, *Civil Jurisdiction and the Indian Reservation* 1973 Utah L. Rev. 206. Today courts recognize Indian tribes as "unique aggregations possessing attributes of sovereignty over both their members and their territory . . . they are 'a separate people' possessing 'the power of regulating their internal and social relations . . .' " *United States v. Mazurie,* 419 U.S. 544, 557, 42 L. Ed. 2d 706, 95 S. Ct. 710 (1975), *quoting United States v. Kagama,* 118 U.S. 375, 381-82, 30 L. Ed. 228, 6 S. Ct. 1109 (1886). This statement rests on a policy first articulated in *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 557, 561, 8 L. Ed. 483 (1832), in which the Supreme Court held:

---

[1]This court may take judicial notice of any provision of the Blackfeet Tribal Law and Order Code of 1967 as amended. *See* CR 9(k); RCW 5.24.010 *et seq.*; RCW 5.44.050.

[T]he several Indian nations [are] distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guarantied by the United States.

. . .

. . . . *The whole intercourse between the United States and this [Indian] nation, is, by our constitution and laws, vested in the government of the United States.*

(Italics ours.) The Supreme Court has recently noted " 'the policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history.' "[2] *McClanahan v. Arizona Tax Comm'n*, 411 U.S. 164, 168, 36 L. Ed. 2d 129, 93 S. Ct. 1257 (1973). *See Warren Trading Post Co. v. Arizona Tax Comm'n*, 380 U.S. 685, 686-87, 14 L. Ed. 2d 165, 85 S. Ct. 1242 (1965). Thus, Congress has consistently acted upon the assumption that the states have no power to regulate affairs of Indians on reservations and has expressly granted jurisdiction to the states when it has desired to do so. *Williams v. Lee*, 358 U.S. 217, 220, 3 L. Ed. 2d 251, 79 S. Ct. 269 (1959).

The Indian sovereignty doctrine has not remained static during the last century. Changing conditions led the Supreme Court in *Williams v. Lee, supra* at 219, to modify the principle of *Worcester v. Georgia, supra,* "in cases where essential tribal relations were not involved and where the rights of Indians would not be jeopardized . . ." In *Williams*, the court held that state courts could not exercise jurisdiction over a civil suit by a non-Indian against an Indian where the cause of action arose out of a commercial transaction on an Indian reservation.

[A]bsent governing Acts of Congress, the question [is] whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them.

---

[2] We also note that "[a]t an early period it became the settled policy of Congress to permit the personal and domestic relations of the Indians with each other to be regulated . . . according to their tribal customs and laws." *United States v. Quiver*, 241 U.S. 602, 603-04, 60 L. Ed. 1196, 36 S. Ct. 699 (1916).

*Williams v. Lee, supra* at 220. The principle of Indian sovereignty is a backdrop against which to read the applicable treaties and statutes, state and federal, which define the limits of state power. *See Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 36 L. Ed. 2d 114, 93 S. Ct. 1267 (1973); *McClanahan v. Arizona Tax Comm'n, supra* at 172. Such an approach was employed by this court in *State ex rel. Adams v. Superior Court,* 57 Wn.2d 181, 356 P.2d 985 (1960), and *In re Colwash,* 57 Wn.2d 196, 356 P.2d 994 (1960), which held that, under the then-existing law, the state probate court was without jurisdiction to determine the custody of Indian children residing on a reservation within Washington.

### III

■ Jurisdiction over the subject matter of an action is an elementary prerequisite to the exercise of judicial power. It is the authority of the court to hear and determine the class of actions to which the case belongs. *See Washington Optometric Ass'n v. Pierce County,* 73 Wn.2d 445, 447 n.1, 438 P.2d 861 (1968). A court lacking such jurisdiction may do nothing other than enter an order of dismissal. *Deschenes v. King County,* 83 Wn.2d 714, 716, 521 P.2d 1181 (1974).

### A

Respondents Anderson predicate Washington jurisdiction to determine the custody of Daniel Duckhead Buehl on two alternative grounds. First, they rely upon RCW 37.12.010, enacted under the Congressional authorization contained in Public Law 83-280, ch. 505, § 7, 67 Stat. 588.[3] The statute was an attempt to strike a balance between abandoning the Indian to the states and maintaining them as wards of the federal government, subject only to federal or tribal jurisdiction. Goldberg, *Public Law 280: The Limits of State Jurisdiction Over Reservation Indians,* 22 U.C.L.A. L. Rev. 535, 537 (1975). The Act of August 15, 1953, gave the

---

[3]Although section 7 of the 1953 act was repealed in 1968 by section 403 of Public Law 90-284, this amendment did not affect any cessation of jurisdiction made prior to repeal. 25 U.S.C. § 1322(b) (1970).

consent of the United States to states, other than those enumerated,[4] "to assume jurisdiction [over criminal offenses and civil causes of action] at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof." Act of August 15, 1953, ch. 505, § 7, 67 Stat. 590.

This State took the requisite action in adopting RCW 37.12.[5] *Tonasket v. State*, 84 Wn.2d 164, 525 P.2d 744 (1974). The state statute provides, *inter alia*:

> The state of Washington hereby obligates and binds itself to assume criminal and civil jurisdiction over Indians and Indian territory, reservations, country, and lands within this state in accordance with the consent of the United States given by the act of August 15, 1953 (Public Law 280, 83rd Congress, 1st Session), but such assumption of jurisdiction shall not apply to Indians when on their tribal lands or allotted lands within an established Indian reservation and held in trust by the United States or subject to a restriction against alienation imposed by the United States, unless the provisions of RCW 37.12.021 [the Indian consent provision] have been invoked, except for the following:
>
> . . .
>
> (6) Adoption proceedings;

RCW 37.12.010. Thus, in *Comenout v. Burdman*, 84 Wn.2d

---

[4]The act granted civil and criminal jurisdiction over reservation Indians to California, Minnesota, Nebraska, Oregon, and Wisconsin, states which were then able and willing to assume such jurisdiction, 28 U.S.C. § 1360(a) (1970); 18 U.S.C. § 1162(a) (1970). Alaska was added in 1958. Act of August 8, 1958, Pub. L. No. 85-615, § 2, 72 Stat. 545.

[5]The original federal statute gave consent to state assumption of jurisdiction regardless of the desires of the Indians affected. The first attempt by this state to accept jurisdiction in this manner was opposed by Indians and defeated. Goldberg, *Public Law 280: The Limits of State Jurisdiction Over Reservation Indians*, 22 U.C.L.A. L. Rev. 535, 547 n.58 (1975). RCW 37.12, as enacted in 1957, permitted Washington to assume jurisdiction only following a resolution of request from individual Indian tribes. Former RCW 37.12.020, Laws of 1957, ch. 240, § 2. In 1963, the state statute was amended to extend jurisdiction over some matters without prior tribal consent. RCW 37.12.010. Congress, in 1968, amended Public Law 83-280 itself so that henceforth no state could acquire jurisdiction over the objections of affected Indians. 25 U.S.C. § 1326 (1970). See footnote 3.

192, 525 P.2d 217 (1974), we held that Washington courts had jurisdiction to terminate the parental rights of Indians residing on their reservation within this state.

■ In this case, because RCW 37.12.010 applies only to Indian country, and Indian residents of such reservations, *within the borders of this state,* we reach a conclusion different from *Comenout.* In these circumstances, this State's intervention is territorially limited by the scope of the consent to state jurisdiction given by Congress. Public Law 83-280 is entitled:

AN ACT

To confer jurisdiction on the States . . . with respect to criminal offenses and civil causes of action committed or arising on Indian reservations within such States, and for other purposes.

67 Stat. 588 (1953). Although the geographical extent of Congress' jurisdictional grant is not often mentioned by the draftsmen, quite possibly because the intent was so evident from the act's structure and language, the House Committee Report refers to the extension of civil jurisdiction of the states "to the Indian country *within their borders.*" (Italics ours.) H.R. Rep. No. 848, 83rd Cong., 1st Sess. 6 (1953). The committee reports contain no indication that Public Law 83-280 was intended to consent to state jurisdictions over Indians temporarily within this state and not present on any reservation. This and other courts have been careful to qualify the language in Public Law 83-280 cases. In *Comenout v. Burdman, supra* at 201, we referred to "the intent of the legislature in 1963 to give the state jurisdiction over all Indian tribes *within the state* . . ." (Italics ours.) The court in *Quinault Tribe v. Gallagher,* 368 F.2d 648, 651 (9th Cir. 1966), *cert. denied,* 387 U.S. 907 (1967), observed "[u]nder section 7 of the act, Congress authorized any other state to extend jurisdiction of this kind to Indian country *lying within those states.*" (Italics ours.) In sum, Congress has not consented to, nor has this State sought, extension of Washington jurisdiction over this or other pro-

ceedings arising on Indian reservations outside the borders of this state.[6]

## B

Second, respondents Anderson invoke the rule that "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones, supra* at 148-49. Courts which have passed upon this contention in custody matters have phrased the question thus presented as follows:

> If then, Indians are to be accorded such independence and sovereignty within the limits of their reservation, and if on the other hand, they subject themselves to the benefits and obligations of state law when without, the question becomes at what point the transformation . . . is accomplished.

*Wisconsin Potowatomies v. Houston*, 393 F. Supp. 719, 730 (W.D. Mich. 1973); *accord, Wakefield v. Little Light*, 276 Md. 333, 347 A.2d 228, 237 (1975).

In *Wisconsin Potowatomies*, the Indian tribe was held to have the right to determine the custody, care, and control of three orphaned children of an Indian father and non-Indian mother who were born off the reservation but had lived on the reservation for about 18 months prior to the

---

[6]We note that the Blackfeet Tribe has not consented even to the jurisdiction of the state in which its reservation lies and that Montana has not assumed such jurisdiction. The Montana Constitution reaffirms the state's agreement with the United States that "all lands owned or held by any Indian or Indian tribe shall remain under the absolute jurisdiction and control of the congress of the United States". Mont. Const. art. 1 (1972). Under Public Law 83-280 Montana has assumed only criminal jurisdiction over the Flathead Indians and their reservation. Mont. Rev. Code Ann. § 83-801 *et seq.* (1966). In *Kennerly v. District Court*, 400 U.S. 423, 27 L. Ed. 2d 507, 91 S. Ct. 480 (1971) (per curiam), the court held unilateral action by the Blackfeet Tribal Council did not vest jurisdiction in the Montana courts under either Public Law 83-280, which requires affirmative state legislative action, or under the 1968 amendment, which requires a majority vote of all enrolled members of the tribe. Even if the tribe had consented and Montana assumed jurisdiction, it would not affect the conclusion reached here with regard to the jurisdiction of Washington courts.

death of the parents. The children were made temporary wards of the state probate court and the tribe brought a suit to regain custody in federal court. The court held that "the only rational approach" in cases such as these "is to determine the domicile of the children at the time their physical custody was gained by the . . . court." *Wisconsin Potowatomies v. Houston, supra* at 731. Although the state court had gained custody over the children at a time when they were beyond the boundaries of the reservation, the court carefully scrutinized the circumstances leading to their presence off the reservation and concluded the tribal court had exclusive jurisdiction to determine custody.

The holding of *Wisconsin Potowatomies* was adopted by the Maryland Court of Appeals in *Wakefield v. Little Light, supra*, a case very similar to the present one. Following serious injury to her mother, a Crow Indian child was made a ward of the tribal court and placed with "appointed legal guardians" for 1 year. The child was removed to Arizona and later moved to the guardians' home in Maryland. Subsequently, the guardians filed an adoption petition in state court. Following her petition, the mother was awarded custody by the tribal court. In the appeal of the adoption proceeding, the state's highest court held that the chancellor properly declined to interfere with the jurisdiction over the Indian child's custody which was already vested in the Crow Tribal Court. The Court of Appeals noted several state interests in the child's custody, including attendance in public schools and a lengthy period in the state extending beyond the expiration of the tribal court's decree, which it balanced against the emphasis on Indian self-government in federal law. Following *Wisconsin Potowatomies*, the court concluded that domicile of the Indian child is the appropriate inquiry. "By using the Indian child's domicile as the state's jurisdictional basis, the Indian tribe is afforded significant protection from losing its essential rights of child-rearing and maintenance of tribal identity." *Wakefield v. Little Light, supra* at 238.

The third case dealing with the question presented by the application of the general rule regarding Indians going beyond reservation boundaries is *In re Greybull*, .......... Ore. App. .........., 543 P.2d 1079 (1975). There the court held that the state juvenile court had jurisdiction of a proceeding for the termination of the parental rights of Indian parents. The court noted *Wisconsin Potowatomies v. Houston, supra,* and did not disapprove it, but found the case before it distinguishable because the parents had not lived on the reservation for nearly 10 years and the Indian children had never lived on the reservation. The domicile of all the parties was outside the reservation of their tribe.

■■ In the present case, Daniel Duckhead Buehl was removed from the Blackfeet reservation after being placed in the protective custody of the tribal court. It was under tribal court authority that the child came to this state and the period away from the reservation was limited by the court's order.[7] While generally a minor has the same domicile as the parent with whom the child lives, *see In re Rankin,* 76 Wn.2d 533, 536, 458 P.2d 176 (1969), the domicile of a child who is a ward of the court is the location of the court, *Betts v. Betts,* 3 Wn. App. 53, 58, 473 P.2d 403 (1970). *Accord,* Restatement (Second) of Conflict of Laws § 22 (1971). Even when the guardian is permitted to remove the child to a new location, the child will be held not to have acquired a new domicile if the guardian's authority did not extend to fixing the child's domicile there. Restatement (Second) of Conflict of Laws § 22, comment *h* at 91 (1971). In the absence of an express indication by the court, the authority of the person in temporary control of the child to fix the child's domicile is ascertained "by interpreting the court's various orders and decrees in the light of the circumstances attending their issuance." Restatement, *supra* at 92. The fact that the tribal court's placement

---

[7]Chapter 7, section 7 F., of the Blackfeet Tribal Code, provides that "[t]he Court may permit removal of neglected, dependent or delinquent juveniles from the reservation by the person or institution in whose custody the juvenile is given, on condition that such custodian produce the juvenile when required by the Court."

of the child with respondents was probationary and limited to 1 year indicates that no such authorization was intended by the court. This time limitation and the express provision for petition by the natural mother after 6 months evidence the court's intention of retaining control over the child until more permanent arrangements were made by the court. Because Daniel Duckhead Buehl was domiciled on the Blackfeet reservation when he was made a ward of the tribal court on September 6, 1973, and because the court did not intend a change in his domicile to be accomplished by his temporary stay in Washington, the child did not go "beyond the reservation boundaries" and become subject to Washington jurisdiction by virtue of the general rule stated in *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 36 L. Ed. 2d 114, 93 S. Ct. 1267 (1973).

## C

As discussed, there is no act of Congress governing the jurisdiction of our State courts in proceedings such as those below. Under these circumstances, in litigation between Indians and non-Indians arising out of conduct on an Indian reservation, resolution of the conflicts between the jurisdiction of state and tribal courts has depended on "whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." *Williams v. Lee*, 358 U.S. 217, 220, 3 L. Ed. 2d 251, 79 S. Ct. 269 (1959). *Accord, Kennerly v. District Court*, 400 U.S. 423, 426-27, 27 L. Ed. 2d 507, 91 S. Ct. 480 (1971) (per curiam). Since this case involves only Indians, *at least* the same standard must be met before state courts may exercise jurisdiction. *McClanahan v. Arizona Tax Comm'n*, 411 U.S. 164, 168-73, 36 L. Ed. 2d 129, 93 S. Ct. 1257 (1973).

In *Fisher v. District Court*, 424 U.S. 382, 47 L. Ed. 2d 106, 96 S. Ct. 943 (1976) (per curiam), the United States Supreme Court recently applied these principles to a situation much like that in the present case. There a Cheyenne Tribal Court awarded temporary custody to a Mrs. Runsabove and made the neglected child a ward of the tribal court. The Runsaboves initiated adoption proceedings in a

Montana state court, but the Supreme Court held that tribal court jurisdiction in such cases was exclusive, stating at page 947:

State court jurisdiction plainly would interfere with the powers of self-government conferred upon the . . . Tribe and exercised through the tribal court. It would subject a dispute arising on the reservation among reservation Indians to a forum other than the one they have established for themselves. . . . [I]t would create a substantial risk of conflicting adjudications affecting the custody of the child and would cause a corresponding decline in the authority of the tribal court.

(Footnote omitted.) These same reasons are fully applicable to the present case. The only significant conduct supporting the adoption petition which took place off the reservation was the presence of Daniel Duckhead Buehl in this state for a time. *Cf. Fisher v. District Court, supra* at 948 n.14. In the circumstances of this case, that fact is of marginal relevance. Had the Andersons complied with the tribal court's orders, that period would have been only 9 months in duration.

We agree with the court in *Wakefield v. Little Light, supra* at 237-38, that "there can be no greater threat to 'essential tribal relations,' and no greater infringement on the right of the . . . [t]ribe to govern themselves than to interfere with tribal control over the custody of their children . . . ." Assertion of jurisdiction by Washington courts in this case would violate the proscription of *Williams v. Lee, supra.* "If tribal sovereignty is to have any meaning at all at this juncture of history, it must necessarily include the right . . . to provide for the care and upbringing of its young, a *sine qua non* to the preservation of its identity." *Wisconsin Potowatomies v. Houston,* 393 F. Supp. 719, 730 (W.D. Mich. 1973). Since the adoption proceeding is appropriately characterized as litigation arising on an Indian reservation, the jurisdiction of the Blackfeet Tribal Court is exclusive.[8]

---

[8]As noted in footnote 6, the Blackfeet Tribe has not consented to jurisdiction by Montana. In January 1971, the Blackfeet Tribal Council

## IV

■ Even had Congress consented to an assumption by Washington of juvenile jurisdiction over Indians temporarily within this state, the superior courts would be required to decline its exercise in these circumstances. We have long adhered to the "clean hands" doctrine in child custody matters which serves to preclude jurisdiction to examine the merits of a requested permanent custody change if the child is brought into the state, or retained here, in violation of a valid custody order of a sister court. *In re Mullins*, 26 Wn.2d 419, 174 P.2d 790 (1946). The rule is designed to prevent forum shopping and repeated litigation of custody awards. *In re Marriage of Saucido*, 85 Wn.2d 653, 656, 538 P.2d 1219 (1975). The foreign custody decree must be valid and binding so as to be entitled to full faith and credit.

■ Tribal court decrees are entitled to full faith and credit to the same extent as decrees of sister states. *Jim v. CIT Financial Servs. Corp.*, 87 N.M. 362, 533 P.2d 751 (1975). The validity of the tribal court order of March 20, 1974, is not contested by respondents. The order is entitled to full faith and credit because the tribal court, on March 20, had jurisdiction of the child, who was then domiciled on the reservation,[9] and the subject matter.[10] *See In re Mar-*

amended the tribal code to provide in part: "under no conditions does the State of Montana have jurisdiction over this Code, and . . . any portion now in the Blackfeet Tribal Law and Order Code relating to concurrent jurisdiction with said State of Montana be deleted." This modification was not mentioned by the court in *United States ex rel. Cobell v. Cobell*, 503 F.2d 790 (9th Cir. 1974), which concluded that the Blackfeet has disclaimed tribal jurisdiction over marriage, divorce, and adoption. Our examination of the pertinent statutes, particularly chapter 7 of the code, supports the position of Judge Duniway, dissenting in *Cobell*, that the Blackfeet Tribal Court possesses jurisdiction to determine the custody of Blackfeet children. *Cf. Bad Horse v. Bad Horse*, 163 Mont. 445, 517 P.2d 893 (1974), *cert. denied*, 419 U.S. 847 (1974).

[9] Chapter 7, section 1B., of the Blackfeet Tribal Code, defines "juvenile" as "any Indian, male or female, under the age of 18 years." Section 2 provides that the "Court shall have continuing jurisdiction until the juvenile reaches age 18."

[10] Chapter 7, section 2, of the Blackfeet Tribal Code, provides that the court "shall have original jurisdiction in all proceedings coming within the terms of this Chapter [the Juvenile Code]." That chapter

*riage of Saucido, supra* at 657. The court order of that date specified that placement of Daniel with respondents was for 1 year only. Irrespective of any subsequent action by Tribal Court Judge Sharp, respondents were required to return Daniel Duckhead Buehl to the court on March 20, 1975. This they failed to do prior to the Superior Court's ruling in their adoption action on June 17, 1975. At that time, therefore, respondents were retaining the child in this state in violation of the tribal court order of March 20, 1974. In these circumstances, the "clean hands" doctrine applies to prevent respondents' attempt to relitigate a matter determined adversely to them in a prior proceeding. The Andersons also argue that the length of time Daniel has been with them in Washington is a significant consideration in determining which placement is in the best interest of the young child. A substantial portion of this time period, however, has been accumulated during retention of the child in violation of the tribal court order and protracted litigation. These consequences are of the kind sought to be prevented by the "clean hands" doctrine.

The dismissal of the adoption proceeding is affirmed; the interlocutory order in the habeas corpus proceeding is reversed and the cause dismissed.

HAMILTON, WRIGHT, BRACHTENBACH, HOROWITZ, and DOLLIVER, JJ., concur.

STAFFORD, C.J., and HUNTER, J., concur in the result.

ROSELLINI, J. (concurring in the result)—I concur in the result only upon the doctrine of clean hands. I do not agree with the other language found in the opinion.

HUNTER, J., concurs with ROSELLINI, J.

Petition for rehearing denied December 2, 1976.

---

includes proceedings to determine whether a child is neglected, dependent, or delinquent and gives the court authority to "make such orders for the commitment, custody, and care of the juvenile and take such other actions as it may deem advisable and appropriate in the interests of the juvenile and the interests of the Tribe." Blackfeet Tribal Law and Order Code of 1967 as amended, Ch. 7, §§ 4, 7 A.